United States District Court
District of Massachusetts

F.B.,
G.G.
    *Plaintiffs*

v.                                    Civil Action No.: 1:22-cv-11851

MELVIS C. ROMERO, former prison guard, in his
individual and official capacity; MASSACHUSETTS
DEPARTMENT OF CORRECTION (DOC); WELLPATH; CAROL
MICI, Commissioner of Correction, of the Massachusetts Correctional
Institution at Framingham (MCI Framingham) in her individual
and official capacity; SUZANNE THIBAULT, former superintendent,
in her individual and official capacity, KRISTIE LADOUCEUR,
former superintendent of MCI Framingham, in her individual
and official capacity; PATRICIA MALANSON,
former Deputy Superintendent of Operations at
MCI Framingham, in her official and individual
capacity; KEITH NANO, former Deputy
Superintendent of Operations at MCI Framingham,
in his official and individual capacity; JOHN DEAN,
former Deputy Superintendent at MCI Framingham, in his
official and individual capacity; RYAN DONLON,
Director of Security at MCI Framingham, in his individual
and official capacity; ROBERT TARANTINO, Special
Housing Unit Captain at MCI Framingham, in his individual
and official capacity; ROBERT LEFORT, the Housing Unit
Captain at MCI Framingham, in his individual and official
capacity; DAVID TUCKER, Commander of Inner Perimeter
Security (IPS) at MCI Framingham, in his individual and
official capacity; MORGANN MCGINTY, Director of Mental Health
Services, in her individual and official capacity, JOHN DOE 1-10,
past or present MCI Framingham employees, in their individual
and official capacity
    *Defendants*

## **COMPLAINT**

## <u>**INTRODUCTION**</u>

*"It is difficult to conceive of any setting where the power dynamic could be more imbalanced than that between a male guard and a female inmate … the confinement setting is a tinderbox for sexual abuse." – Circuit Judge Scudder, U.S. Court of Appeals, 7th Circuit*

1. The Plaintiffs in this case are two women who were confined by the Department of Correction (DOC) at the Massachusetts Correctional Institution at Framingham (MCI Framingham).  They bring this action against a former prison guard named Melvis C. Romero who repeatedly sexually assaulted them, and against the other Defendants for their systemic failure to detect, investigate and prevent sexual assault, their failure to supervise the prison guards, and to provide reasonably necessary medical treatment to Plaintiffs while these assaults were ongoing and afterward.

2. The Defendants were aware that the Plaintiffs suffered from severe mental illness and opioid use disorder and confined them to a special housing unit for their protection and treatment.

3. The Defendants were aware both that guard-on-inmate sexual assault was a pervasive problem and that these women were particularly vulnerable to it.

4. These Defendants nonetheless failed to train, supervise, detect and investigate Romero who was in effect given free rein to sexually abuse four women on over fifty occasions for a period spanning at least six months.

5. Romero did this by isolating the women and leading them into a utility closet where he sexually abused them.

6. On numerous occasions Romero left his post in violation of protocols which the Defendants failed to enforce.

7. He escorted the women alone past various surveillance cameras which the Defendants failed to actively monitor.

8.  He cornered them in a closet because the Defendants failed to ensure that these vulnerable women's movement throughout the prison was documented and their locations accounted for.

9.  On at least one occasion Romero passed a note through another prison guard to F.B. (also referred to herein as Ms. B.) instructing her when and where to meet him for a sexual encounter.

10. On at least one occasion a prison guard summoned Ms. B. to report to Romero who then proceeded to take her into the closet and sexually abuse her.

11. Around the time that Romero began his abuse against Ms. B., medical staff ordered DNA and Sexually Transmitted Infection testing on her for the first time during her prison term.

12. All four women, including the two plaintiffs named here, were later named as victims in investigations conducted under the Prison Rape Elimination Act (PREA) and the criminal investigation by the Middlesex District Attorney's Office (MDAO).

13. Ms. B. was eventually notified by prison officials that her PREA allegations had been substantiated.

14. Romero was fired from his job.

15. To the best of Plaintiffs' knowledge, the MDAO has not sought any criminal charges against any Defendant.

16. While the assaults were ongoing and after the assaults were discovered, both Plaintiffs suffered tremendous psychological pain and repeatedly engaged in self-harm in response.

17. One of the Plaintiffs attempted self-harm by wrapping a seatbelt around her neck.

18. On multiple occasions, each Plaintiff ingested harmful and caustic chemicals available to them in their cells.

19. Each time the Plaintiffs suffered a mental health crisis the Defendants responded by confining them in solitary cells for prolonged periods of time where they were afforded little to no human contact, no therapeutic treatment, no opioid use treatment, and no access to treatment services available to other inmates.

20. Each of the individually named Defendants had official responsibility for policies, procedures, supervision and training related to the prevention, detection and deterrence of sexual abuse and each acted with deliberate indifference to the risk and reality of sexual abuse in their prison.

21. Subjecting prisoners to an environment in which they are sexually assaulted and in which sexual assaults are likely to occur violated the Plaintiffs' rights to personal security, bodily integrity and to be free from cruel and unusual punishment as well as their rights under the Eighth and Fourteenth Amendments to the United States Constitution and article 26 of the Massachusetts Declaration of Rights.

22. Subjecting inmates with severe mental illness and opioid use disorder to solitary confinement for prolonged periods, failing to provide them with adequate recovery and mental health treatment, including treatment which was then available to other imprisoned women, and doing so in the wake of their known sexual victimization violated the Plaintiffs' right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and article 26 of the Massachusetts Declaration of Rights as well as their rights to be free from discrimination on account of a disability under the Americans with Disabilities Act.

23. Plaintiffs seek compensatory and punitive damages as well as declaratory relief for the deprivation of their rights secured to them by the Constitution, laws and regulations of the United States and the Commonwealth of Massachusetts.

## **PARTIES**

24. Plaintiff F.B., (also referred to herein as Ms. B.), of Palmer, Massachusetts, was at all relevant times an inmate at MCI Framingham.

25. Plaintiff G.G., (also referred to herein as Ms. G.), of Chatham, Massachusetts, was at all relevant times an inmate at MCI Framingham.

26. Defendant Melvis C. Romero was a prison guard employed by the DOC at all relevant times.  The DOC and the various Defendants trained and supervised him at all times during his employment.  The DOC and various defendants assigned him to units and dorms which housed women suffering from histories of complex trauma and opioid use disorders in a specially designated unit at MCI Framingham.  As such, the Defendants assigned him to protect the Plaintiffs' well-being as well as monitor and control their movements.  The Defendants gave Romero authority to give orders to the women, issue disciplinary violations when they did not obey, initiate proceedings to determine their level of punishment, search their physical bodies and cells, and physically restrain those who did not obey or comply with his commands. Defendant Romero is being sued in his individual and official capacity.

27. The Department of Correction (DOC) is a state agency and a political subdivision of the Commonwealth of Massachusetts.  The DOC receives federal financial assistance.

28. WellPath is a health services company contracted by the DOC to provide medical care to the women in DOC custody with corporate headquarters in Tennessee.

29. Defendant Carol Mici was Commissioner of the DOC during all relevant times.  As such, she was responsible for the policies, practices, supervision, instruction, training, acts and conduct of employees there, including Defendant Romero, as well as for the care, control, protection, safety, and well-being of inmates there, including Plaintiffs F.B. and G.G.  Commissioner Mici is being sued in her individual, supervisory and official capacity.

30. Defendant Suzanne Thibault was Superintendent of MCI Framingham during the relevant time period, including from September 2019 through November 2019.  As such, she was responsible for its policies, including policies related to inmate medical care, as well as for the procedures, supervision, training, acts, and conduct of employees, including Defendant Romero, as well as for the care, control, protection, safety, and well-being of women there, including Plaintiffs F.B. and G.G. Superintendent Thibault had final decision-making authority pertaining to operational issues and was required to review all facility incidents.  Superintendent Thibault was also required to staff a "PREA Committee" comprised of the PREA Manager, upper-level management officials, line supervisors, investigators, medical and/or mental health practitioners, and any other individual deemed integral to successful implementation of the PREA process at that site.  She was tasked with regular review of MCI Framingham's security protocols as it related to the successful implementation of PREA protocols, including the maintenance of adequate staffing levels, assessment of monitoring technology, and data collection for corrective actions related to the prevention of sexual assault.  Superintendent Thibault is being sued in her individual, supervisory and official capacity.

31. Defendant Kristie Ladouceur was the Superintendent of MCI Framingham during the relevant time period, including from December 2019 through March 2020.  Her responsibilities and tasks were the same and are incorporated by reference as those which were mentioned above as they pertained to Superintendent Thibault. Superintendent Ladouceur is being sued in her individual, supervisory and official capacity.

32. Defendant John Dean was Deputy Superintendent at MCI Framingham for part of the relevant time period, including from at least January 2020 through March 2020.  As such, he was responsible for the policy, practices, supervision, instruction, training, acts and conduct of employees there, including Defendant Romero, as well as for the care, control, protection, safety, and well-being of the women there, including Plaintiffs F.B. and G.G.  Deputy Superintendent Dean is being sued in his individual, supervisory and official capacity.

33. Defendant Patricia Malanson was the Deputy Superintendent of Operations at MCI Framingham from September 2019 through October 2019.  As such, she was responsible for the policies, procedures, supervision, training, acts, and conduct of employees there, including Defendant Romero, as well as for the care, control, protection, safety, and well-being of the women there, including Plaintiffs F.B. and G.G.  Deputy Superintendent Malanson was also responsible for providing sound decision-making and input to the Superintendent in problem solving daily operational issues, managing daily institutional staffing patterns, and managing and supervising various staff.  Deputy Superintendent Malanson is being sued in her individual, supervisory and official capacity.

34. Defendant Keith Nano was the Deputy Superintendent of Operations at MCI Framingham for part of the relevant time period, including from at least October 2019 through December 2019.  Defendant Nano's responsibilities were the same and are incorporated by reference as those which were mentioned above with regards to Defendant Malanson.  Deputy Superintendent Nano is being sued in his individual, supervisory and official capacity.

35. Defendant Ryan Donlon was the Director of Security at MCI Framingham from September 2019 through March 2020.  As such, he was responsible for the care, custody, supervision, and control of the women there.  He was also responsible for reviewing all security related operations, reports of incidents, for making recommendations for changes to DOC security policies, providing sound decision-making to the Deputy Superintendent of Operations as regards operational issues, managing daily institutional staffing patterns and performance, and for managing and supervising various staff.  The Director of Security is also tasked with regular review of MCI Framingham's security protocols as it relates to the implementation of PREA, including an assessment as to the adequacy of staffing levels, assessment of monitoring technology and data collection for corrective actions as they relate to the prevention of sexual assault.  Director Donlon is being sued in his individual, supervisory and official capacity.

36. Defendant Robert Lefort was the Housing Unit Captain at MCI Framingham from September 2019 through March 2020.  As such, he was responsible for overseeing and directing operations within the facility, the evaluation, development, training, acts and conduct of employees there, including Defendant Romero, as well as for the care,

protection, safety and well-being of the women there, including Plaintiffs F.B. and G.G.  Captain Lefort is being sued in his individual, supervisory and official capacities.

37. Defendant Robert Tarantino was the Special Housing Unit Captain at MCI Framingham from September 2019 through March 2020.  As such, he was responsible for overseeing and directing operations within the facility, the evaluation, development, training, acts and conduct of employees there, including Defendant Romero, as well as for the care, protection, safety, and well-being of the women there, including Plaintiffs F.B. and G.G.  Captain Tarantino is being sued in his individual, supervisory and official capacity.

38. Defendant David Tucker was Commander of Inner Perimeter Security (IPS) at MCI Framingham from September 2019 through March 2020.  As such, he was responsible for the policies, practices, supervision, training, acts and conduct of employees there, including Defendant Romero, as well as for supervision of various IPS officers to ensure they follow and comply with policies and procedures, and for the care, protection, safety and well-being of the women there, including Plaintiffs F.B. and G.G.  Under his supervision, IPS employees are charged with stemming illegal activity when there is reasonable suspicion that such illegal conduct occurred and/or will reoccur.  Under his supervision, IPS personnel are also tasked with visually monitoring activities through cameras in real time and to alert their supervisors if intervention is required.  IPS employees also have the ability to store and retrieve video surveillance footage.  Commander Tucker must also review employees' incident reports and transmit them to the Superintendent to determine a

future course of action in response to security gaps.  Commander Tucker is being

sued in his individual, supervisory and official capacity.

39. Defendant Morgan McGinty was the Mental Health Director at MCI Framingham

during all relevant times.  She was responsible for applying sound judgment to the

planning, management, coordination, direction, and supervision of clinical-mental

health services and staff, including but not limited to assigning specific duties and

clinical responsibilities, professional education, and staff development of mental

health professionals.  Defendant McGinty was responsible for ensuring that all mental

health professionals who treated F.B. and G.G. complied with requirements of PREA,

and that they were trained on and utilized a "passive surveillance system" designed to

detect and assess the signs of sexual abuse.  She was required to report in writing to

the Shift Commander and Superintendent when an inmate exhibited symptoms or

injuries consistent with sexual abuse.  She was also responsible for ensuring that line

mental health professionals provided victims of sexual assault with PREA-mandated

notices and exams, including but not limited to, referrals to off-site mental health

services, a physical examination, and access to STI and pregnancy testing.  Defendant

McGinty is being sued in her individual, supervisory and official capacity.

40. John Doe 1-10 was a past or present prison official, which includes but is not limited

to the Shift Commander, Sergeant, Lieutenant, Senior Health Services Administrator,

Mental Health Director, medical staff and prison personnel.

## FACTS

41. MCI Framingham is a prison facility owned and operated by the Massachusetts

Department of Correction, a state agency, located in Framingham, Massachusetts.

42. It is the only state prison facility in Massachusetts that houses women being held pending trial or convicted and serving sentences.

43. The Defendants held Ms. B. in their custody at MCI Framingham from May 2018 until January 2021.

44. The Defendants held Ms. G. in their custody from approximately September 2019 until September 2020.

45. Each of the individually named Defendants assumed responsibility for the Plaintiffs safety and well-being.

46. Each individual Defendant knew that sexual abuse in prisons in the United States was and still is an epidemic.

47. When the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301, et. seq., was enacted in 2003, Congress declared that "experts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison," that, "[i]nmates with mental illness are at increased risk of sexual victimization," and that, "[p]rison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault--if they receive treatment at all."

48. In August 2012, the Department of Justice issued the landmark rule, "National Standards for Detection, Prevention, and Reduction of Prison Rapes."

49. In its final rule, the DOJ set a national standard for prisons related to the detection, prevention, response, and reduction of sexual assaults.

50. These PREA standards set the Constitutional floor concerning the necessity and obligation of prison officials to protect inmates from staff-on-inmate sexual assault.

51. In 2015, the Bureau of Justice Statistics ("BJS") reported that prison staff members were among 42% of the substantiated claims of sexual abuse in prisons.

52. After the Suffolk County Sheriff's Department settled a lawsuit with a former female inmate who alleged she was coerced into having sex with three prison guards, one of whom fathered her child, the Massachusetts Legislature passed G.L. c. 268 § 21A which criminalized guard on inmate sexual relations.

53. This law established that "an inmate shall be deemed incapable of consent to sexual relations with such person."

54. A report published in 2022 by the non-profit group Prisoner's Legal Services interviewed 22 current and formerly incarcerated women at MCI Framingham.  Of the 22 women interviewed, 19 stated that they had either experienced or witnessed sexual harassment or sexual misconduct by prison guards or staff against imprisoned women.

55. Prior to Romero's sexual assaults against the Plaintiffs, it was common knowledge among imprisoned women that he had also sexually assaulted at least two other imprisoned women dating back to at least April of 2018.

56. In addition to the Plaintiffs named here, the other two women were later named as victims in PREA investigations and in the criminal investigation of Defendant Romero by the Middlesex District Attorney's Office (MDAO).  Plaintiffs know both women's names.

*The Defendants Knew that the Plaintiffs Were at Increased Risk of Being Sexually Assaulted.*

57. Each individual Defendant knew that the Plaintiffs were particularly vulnerable to sexual abuse in prison.

58. The Defendants utilized a mandated risk-housing-tool to assess the Plaintiffs for their risk of vulnerability to predatory sexual behavior.

59. This risk assessment tool was based on what are called "known indicators of vulnerability," which included an inmate's physical size and build, history of sexual victimization, the inmate's own perception of vulnerability, substance use history, and mental and physical disability.

60. The Defendants were required to use such information to make individualized determinations about how to ensure the safety of each inmate.

61. F.B., now 29 years old, grew up in Springfield, Massachusetts.

62. The Defendants knew that Ms. B. was diagnosed with severe mental illnesses including chronic forms of post-traumatic stress, bipolar II, attention-deficit, and substance use disorders.

63. The Defendants assigned Ms. B. to live in the "East Unit" which was designated for women being treated for trauma-related mental illness and substance use disorder.

64. The Defendants prescribed her Subutex to treat opiate use disorder.

65. Medical staff documented Ms. B.'s reports that she suffered relapses even while incarcerated.

66. Ms. B.'s dependence on opioids was considered chronic and was well-known to anyone who encountered her at MCI Framingham.

67. Ms. B. suffered an overdose while incarcerated at MCI Framingham on more than one occasion.

68. G.G., now 30 years old, grew up in Barnstable and Chatham, Massachusetts.

69. The Defendants knew that Ms. G. suffered from chronic post-traumatic stress, attention deficit, and substance use disorders.

70. The Defendants designated Ms. G. to live in the "East Unit" where she resided with other inmates, including F.B., also being treated for trauma-related mental illness and prescribed Subutex to treat opiate addiction.

71. Each individual Defendant knew that Plaintiffs were assigned to this specialized Unit, -- including Defendants DOC, WellPath, Thibault, Ladouceur, Malanson, Nano, Dean, Donlon, Tarantino, Lefort, Tucker and McGinty, -- and that Ms. B. and Ms. G. were assigned to this unit because they possessed specific vulnerabilities which placed them at increased risk of being sexually victimized.

*The Defendants knew that the Prison Lacked Adequate Security Measures*

72. Each individually named Defendant knew that MCI Framingham lacked sufficient security measures needed to prevent, detect and deter sexual assault.

73. In August 2017, prison investigators completed an investigation of an attempted escape by an inmate that occurred in May of the same year.

74. During the investigation, the prison investigators initiated a separate investigation of Defendant Romero's actions on that day to determine whether his actions amounted to misconduct.

75. The Defendants received the contents of the 128-page report.  See Exhibit 1.

76. Defendants were placed on notice by prison investigators that the following security vulnerabilities existed at MCI Framingham:

    a.   Several video cameras were inoperable;

b.   A systemic failure by staff to follow post orders and to conduct and document regular accountability checks;

c.   Violations of accountability checks by Shift Lieutenants;

d.   Major institutional counts are often delayed or not even conducted because there is constant movement of imprisoned women, and they are not in their cells at scheduled times;

e.   Inner Patrol does not maintain an activity log as required concerning a particular unit, making it impossible for investigators to determine if a count was conducted;

f.   For long stretches of time (sometimes 20-45 minutes), only one prison guard is posted in an area;

g.   Several violations of post orders at multiple levels of staff, including Inner Patrol staff leaving their posts without proper relief;

h.   A prison guard reported, after the attempted escape, that she heard rumors about an attempted escape and failed to report the suspicion to IPS;

i.   When imprisoned women are in the main yard, it is a common practice for them to go to the bathroom without notifying prison guards;

77. The prison investigators laid out the following recommendations for the Superintendent and Director of Security:

j.   The level of security needed to be "reinforced at all staff levels";

k.   Specifically, oversight of prison guards and Inner Post officers and assurance that they are following post orders;

l.   Regular maintenance of and updates to video cameras;

m.   Installation of additional video cameras;

n.  Assign more than one prison guard to posts to observe areas from different views. <u>See</u> Exhibit 1.

*Melvis Romero's Reign of Sexual Assault*

78. The Defendants assigned Romero to be in charge of the "East Unit" which housed vulnerable women, including the Plaintiffs.

79. Plaintiffs received East Unit Activity Logs for two periods of abuse: October 21, 2019 through December 31, 2019 (72 days); and February 1, 2020 through March 13, 2020 (42 days); (114 days in total).

80.  Romero's supervisors, including the Defendants named above, were responsible for reviewing these logs and/or ensuring adequate staffing levels.

81.  Other correction officers and supervisors frequently made security rounds on the East Unit in the afternoon to ensure that the women were safe and accounted for, unless Romero was working.

82. For the time period mentioned above, Romero's fellow officers and supervisors left him alone from approximately 11:30 am until 1:00 pm during every single one of his shifts.

83.  Rarely was an officer other than Romero left alone during this timeframe, this happened only 15% of the time, whereas 85% of the time a supervisor came to check on the women if Romero was not working.  <u>See</u> Exhibit 2A & 2B.

84. During 100% of Romero's shifts he was left alone and unchecked to carry out his sexual abuse and he frequently did so during this window of time.  <u>See</u> Exhibit 2A & 2B.

85. Beginning November 1 and for the duration of the time-period mentioned above, unlike his fellow officers, never once did Romero document the women's movement from one part of the prison to another, nor document if or when the unit was ever sent to lunch, nor if or when they were sent to the "Med Line" to receive their medication.  This time period for the women on East Unit was a black hole.

*F.B.*

86. When Defendant Romero first became acquainted with F.B. in the fall of 2018, he walked by her very closely on several occasions and whispered, "Hmm, very tempting."

87. Ms. B. knew that Defendant Romero had sexually assaulted at least two other women.

88. In October of 2019, Ms. B. witnessed Defendant Romero punish one of the two women whom he had previously sexually assaulted who will be referred to here as Jane Doe.  Plaintiffs know her name.

89. Ms. B. witnessed Jane Doe refuse sexual contact with Defendant Romero on at least two occasions.

90. Ms. B. watched Defendant Romero berate and punish Jane Doe by locking her in her cell while allowing others on the unit to leave their cells.

91. In November 2019, Romero gained more private access to Ms. B. when he began directly supervising her inmate work assignments in the yard.

92. Defendant Romero permitted Ms. B. certain privileges and did favors for her as a *quid pro quo* for sexual acts.

93. Each time Defendant Romero handed Ms. B. items of basic necessity, such as tampons and toiletry, or doled out privileges, he told her, "you owe me."

94. On multiple occasions, Defendant Romero ordered other yard workers back into the building and allowed Ms. B. more outside yard time.

95. He used these opportunities to be alone with Ms. B. by leaving his post and leading her alone to different parts of the prison.

96. Her location and her movements were neither documented nor accounted for.

97. From October 2019 to March 2020, Defendant Romero ushered Ms. B. into a small utility closet and shut the door behind them on approximately fifty occasions.

98. Surveillance cameras monitored by Inner Perimeter Security were positioned to look at and monitor the entrance or passageways from the yard to the Plaintiffs' unit.

99. Plaintiffs are aware that video footage of Defendant Romero leading both Plaintiffs to the area of the utility closet where he assaulted them was later recovered during an internal investigation.

100.    Inside of the closed closet, Defendant Romero kissed Ms. B. on the mouth, fondled her breasts with his hands, fondled her vagina outside of her pants, and put his mouth on her bare breasts.

101.    Defendant Romero also unbuckled his belt, lowered his pants to the floor, and exposed his penis outside of his underwear and placed it inside of Ms. B.'s mouth.

102.    Confined by the walls and door of the small utility closet and Defendant Romero's half naked body, Ms. B. was required to stand on her knees on the floor and place his penis in her mouth until he ejaculated.

103.    Defendant Romero passed Ms. B. hand-written notes and, on at least one occasion, passed them through another prison guard.  In the notes, he communicated when and where he intended the two to meet privately.

104.    On at least one occasion, a prison guard summoned Ms. B. and ordered her to "report" to Defendant Romero who then led her into the utility closet.

105.    Ms. B. did not have the capacity or agency to refuse Defendant Romero's or the other guard's orders.

106.    If Ms. B. refused the guards' orders, she was at risk of being disciplined and restricted from privileges such as making phone calls to her family.

107.    On various occasions Defendant Romero told Ms. B. that he would use his authority to help her achieve lenient sanctions in the instances that she was cited and disciplined by other prison guards.

108.    This included, but was not limited to, offers by Romero to advocate privately on her behalf to those other prison guards.

109.    Ms. B. believed she needed to act a certain way and to be extra nice to Defendant Romero to avoid angering or disappointing him.

110.    Ms. B. believed she needed to perform sexual acts on Defendant Romero in order to survive.

111.    In October 2019, medical staff ordered and administered vaginal DNA and swab specimen testing for sexually transmitted disease and infection on Ms. B. for the first time in her history at the prison.

112.    Romero's coerced sexual acts occurred approximately fifty times between late October 2019 to March 2020.

113.    During this period of sexual abuse, Ms. B. sought mental health attention by submitting multiple "sick slips."

114.    On some instances, medical staff did not respond for 7 days after her request for medical attention and treatment.

115.    On other instances, medical staff responded after 15 days of her request for medical attention and treatment.

116.    From November 2019 through March 2020 as Romero's abuse continued, Ms. B. reacted to being victimized by ingesting harmful and caustic chemicals on multiple occasions.

117.    Rather than provide mental health or crisis-related treatment, the Defendants constricted her to a solitary cell for a prolonged period of time, she was held in the cell for 22-23 hours per day and was interviewed by mental health staff each day for about 5 minutes through a small opening of the cell door.

118.    While in solitary confinement in either the disciplinary or "medical" setting, Ms. B. received no therapeutic treatment and the DOC prevented her from accessing programs in the East Unit, such as group therapy, recovery courses, and work programs.  In addition, DOC prevented her from in-person visits with family and access to canteen.

119.    On January 27, 2020, Ms. B. told medical staff that she experienced an increase in nightmares and flashbacks, that she felt, "so sad in my sleep, which is a horrible feeling.  I'm not right."  She asked to be seen for one-on-one sessions to process her trauma, she said that she previously relied on substances to numb the feelings but that she did not want rely on substances and was hopeful she could remain sober.

120.    In February 2020, the DOC confined Ms. B. to restrictive housing for seven consecutive days.  She was seen by mental health staff once per day for

approximately 4 minutes where they spoke to her through a small opening of the cell door.

121.    On February 27, 2020, Ms. B. was cited and disciplined for ingesting medication not prescribed to her.

122.    As a result, she was again placed in a solitary cell for approximately ten consecutive days.

123.    In mid-March 2020, as the assaults continued Defendant Romero approached Ms. B. and asked her if "she'd told anyone about them," and she told him she had not.

124.    On or about March 19, 2020, prison investigators and the Massachusetts State Police interviewed Ms. B.

125.    On March 19, 2020, Ms. B. underwent a three-hour interview with prison investigators and the Massachusetts State Police regarding Defendant Romero's victimization of her.

126.    In the days after the interview with prison investigators, the Defendants permitted Romero to return to MCI Framingham in his uniform and badge.

127.    Although placed in a "bubble" and separated from inmates, he was able to see and communicate with Ms. B. through glass partitions.

128.    From behind the glass, Defendant Romero would wave to her and then put his finger over his mouth signaling her to keep quiet.

129.    On March 27, 2020, Ms. B. again attempted to harm herself by swallowing heavy duty chemical cleaner inside of her cell.

130.    The Defendants again responded by placing her in solitary confinement.

131.    In late March or early April 2020, Defendant Romero was terminated from employment by the DOC.

132.    The medical staff at MCI Framingham made no therapeutic changes to Ms. B.'s medications until April 9, 2020.

133.    In early April 2020, the medical staff again administered vaginal DNA and STI testing on Ms. B.

134.    At the beginning of May 2020, Ms. B. was released on parole.

135.    Within three days of her release on parole, Ms. B. suffered a relapse and was accused of violating her parole terms, arrested, and transported back to MCI Framingham.

136.    Police officers drove Ms. B. back to the place where she had been systematically abused.  As they attempted to take her out of the cruiser and back into the prison, Ms. B. attempted to strangle herself by wrapping seatbelts around her neck.

137.    Subsequently, a parole officer issued her a Parole Violation Report in which he alleged that she had committed "irresponsible conduct as shown by your attempt at strangulation" upon being returned to MCI Framingham.  See Exhibit 3.

138.    Upon her return, DOC staff and medical personnel confined Ms. B. to an isolated cell with little to no human contact for prolonged periods of time.

139.    In May 2020, prison investigators formally concluded that the allegations of sexual abuse at the hands of Defendant Romero were substantiated.

140.    From May 2020 until Ms. B.'s release in January 2021, the Defendants repeatedly confined her to restrictive housing which amounted to prolonged solitary confinement.

141.    Prison investigators referred the Romero matter for criminal prosecution to the Middlesex County District Attorney's Office (MDAO).

142.    The MDAO and DOC are in possession of investigation documents which include the following: names of prison investigators, names of witnesses (both staff and imprisoned women), Plaintiffs' audio and video recorded statements, statements by at least one other victim, Massachusetts State Police reports, interviews of Defendant Romero with his attorney present, a confession by him to at least one incident of sexual assault, review of confidential medical reports by medical staff, and relevant surveillance footage.

143.    Ms. B. continues to suffer from mental and physical anguish because of the sexual abuse and inadequate medical treatment she received at MCI Framingham.

*G.G.*

144.    Defendants assigned Ms. G. to the East Unit on or about October 2019.

145.    Defendant Romero's desk was situated directly outside and next to Ms. G.'s cell.

146.    When Defendant Romero sat at the officer desk, he had a direct view of Ms. G. when she was inside of her cell.

147.    Like F.B., Ms. G. was aware that Defendant Romero had previously sexually assaulted other women at the prison.

148.     Defendant Romero solicited Ms. G. for sexual favors through whispered comments.

149.     Initially, Ms. G. refused Defendant Romero's advances.  She told him, "no," and she tried to physically distance herself from him.

150.     In response, Defendant Romero singled her out and refused to open her cell door when other inmates on the unit were permitted to have their doors propped open.

151.     Ms. G. requested tampons from Defendant Romero.  He grabbed her hand with the tampons in it and said, "you owe me now."

152.     As with Ms. B., Defendant Romero permitted Ms. G. certain privileges and did favors for her as a *quid pro quo* for sexual acts.

153.     On various occasions Defendant Romero told Ms. G. that he would use his authority to help her achieve lenient sanctions when she was cited and disciplined by other prison guards.

154.     This included, but was not limited to, offers by Romero to advocate privately on her behalf to those other prison guards.

155.     Like Ms. B., Ms. G. believed she needed to act a certain way and be extra nice to Defendant Romero to avoid angering or disappointing him.

156.     As was often the case, in February 2022, Defendant Romero was the only prison guard in charge of the women on East Unit.

157.     He used this opportunity on two occasions to usher Ms. G. into a utility closet.

158.     No other prison official came to check on Romero.

159.     Ms. G.'s movements and her location were not accounted for.

160.     Surveillance cameras were positioned to monitor the areas and passageways leading to this utility closet.

161.     Inside of the closed closet, Defendant Romero kissed Ms. G. on the mouth, slapped her buttocks, and fondled her breast underneath her clothing.

162.     Defendant Romero unbuckled his belt, lowered his pants to the floor, and exposed his penis outside of his underwear in Ms. G.'s face.

163.     Confined by the walls, door, and Defendant Romero's half naked body, Ms. G. was required to stand on her knees on the floor and place his penis in her mouth.

164.     Ms. G. feared Defendant Romero, and his power intimidated her.

165.     Ms. G. believed she needed to perform sexual acts on Defendant Romero in order to survive.

166.     Prison investigators and the Massachusetts State Police interviewed Ms. G. on two occasions regarding Defendant Romero: in March and then May 2020.

167.     In the days before her interview with prison investigators in March 2020, Defendant Romero was still permitted to return to work at the facility and was able to see and communicate with Ms. G. through glass partitions.

168.     In May 2020, while being restrained by prison guards after she ingested hand sanitizer, Ms. G. told the prison guards "get your hands off me, don't touch me!" and she revealed that she was sexually assaulted by Defendant Romero.

169.     DOC investigators and the Massachusetts State police interviewed Ms. G. again about Defendant Romero.

170.     In the aftermath of the sexual assault and in violation of PREA protocols, Defendants failed to provide Ms. G.:

   a.   access to outside victim advocates for emotional support services related to sexual abuse, which included mental health treatment, contact information for local and national crisis organizations, and reasonable access to these organizations;

   b.   a physical examination by a physician; or

   c.   information about emergency contraception, access to pregnancy tests, and access to tests for sexually transmitted infections.

171.   From March through July 2020, Ms. G. ingested harmful and caustic chemicals nearly every other day.

172.   On at least five occasions, prison guards learned of this.

173.   In response to her mental health crises, Defendants placed her in restrictive housing in an isolated cell for a period of at least 5 days with little to no human contact.

174.   Rather than provide mental health or crisis-related treatment, the Defendants constricted her to a solitary cell for a prolonged period of time, she was held in the cell for 22-23 hours per day and was interviewed by mental health staff each day for about 5 minutes through a small opening of the cell door.

175.   While in solitary confinement in either the disciplinary or "medical" setting, Ms. G. received no therapeutic treatment and the DOC prevented her from accessing programs in the East Unit, such as group therapy, recovery courses, and work programs. In addition, DOC prevented her from in-person visits with family and access to canteen.

176.     Ms. G. is aware that DOC investigators, including Special Investigators for the Superintendent's Office, wrote an in-depth report with findings, decisions on misconduct, and recommendations filed with the Superintendent and Commissioner related to Defendant Romero's sexual abuse of Ms. G.

177.   Prison investigators referred the matter for criminal prosecution to the Middlesex County District Attorney's Office (MDAO).

178.   The MDAO and DOC are in possession of investigation documents which include the following: names of prison investigators, names of witnesses (both staff and inmates), Plaintiffs' audio and video recorded statements, statements by at least one other victim, Massachusetts State Police reports, interviews of Defendant Romero with his attorney present,  a confession by him to at least one incident of sexual assault, review of confidential medical reports by medical staff, and relevant surveillance footage.

179.   On August 19, 2020, an Assistant District Attorney of the MDAO (Raquel Frisardi) and a Massachusetts State Police detective (Trooper Constantino Degisi) spoke directly to Ms. G. via Zoom about providing testimony to the Grand Jury while she was still incarcerated at MCI Framingham.

180.   Ms. G. continues to suffer from mental and physical anguish because of the sexual abuse and inadequate medical treatment she received at MCI Framingham.

181.   To the best of Plaintiffs' knowledge and belief, the Middlesex District Attorney's Office has never presented evidence to a grand jury or moved for criminal charges against Defendant Romero or any other Defendant.

*The Substantial Risk of Harm of Prolonged Segregation and Solitary Confinement for the Plaintiffs.*

182.   Each individual Defendant knew that prolonged isolation for the Plaintiffs who had severe mental illness would exacerbate their symptoms and cause determinantal impact on their physical and emotional wellbeing and increase the likelihood that they would commit self-harm.

183.   In 2007, the DOC hired a nationally recognized prison expert, Lindsay Hayes, to evaluate its management of suicidal prisoners.  The "Hayes Report" stated: "[C]urrent management of suicidal inmates within the DOC is overly restrictive and seemingly punitive.  Confining a suicidal inmate to their cell for 24 hours a day only enhances isolation and is anti-therapeutic.  Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation."

184.   In 2011, the same expert followed up and stated that the same concerns had not been addressed by the DOC and that conditions were unchanged.

185.   In November 2020, the Department of Justice (DOJ) and the Massachusetts U.S. Attorney's Office published the "Investigation of the Massachusetts Department of Correction."  In it, the DOJ cited the Hayes Report and reported that the use of prolonged isolation and restrictive housing conditions remained unchanged.

*Defendants Failed to Adequately Supervise and Train Staff, and Failed to Enforce, Maintain and Implement Policies Necessary to Prevent Sexual Assault.*

186.    Each Defendant was individually responsible for contributing to the prevention and detection of sexual abuse perpetrated by staff against inmates.

187.    Each individual Defendant had official responsibility for the implementation of policies and procedures as well as for the training and supervision related to the prevention and detection of sexual abuse perpetrated by staff against inmates.

188.    Defendants' failures include but are not limited to the following.  <u>Defendants failed to</u>:

a.   establish a procedure to detect Defendant Romero's grooming and cajoling of his victims through continuous favors and punishments which he used to extort sex acts from them;

b.   establish and enforce a procedure, as well as supervise and train employees, related to adequate monitoring of the security cameras to prevent incidents of sexual assault;

c.   enforce and ensure the active monitoring of the security cameras which showed Defendant Romero leading his victims to a utility closet where he committed his abuse on approximately fifty occasions;

d.   maintain cameras in isolated spots where abuse was likely to occur and identify "blind spots" for adequate monitoring of prison guards and inmates;

e.   enforce and ensure that personnel kept track of the women's movements within the facility to ensure that they were safe and always accounted for;

f.   enforce and effectuate a policy which required accurate counts of the women as they moved from one area of the prison to another to assure their health and safety;

g.  maintain policies which prevented a single male officer from being alone while escorting a woman from one area of the prison to another;

h.  enforce a policy which forbade one male officer from staffing an entire unit of vulnerable women;

i.  establish and enforce a policy which prevented prison guards from taking continuous, long leaves of absence from the post to which that guard was assigned – absences and opportunities which Romero used to abuse his victims;

j.  establish a procedure to document and detect the numerous rumors and widespread knowledge among the women in custody that Romero was abusing various inmates; and

k.  supervise and train officers with respect to the particulars of the protection of women with opioid use and mental health disorders.

189.  Many such failures were in direct contravention of PREA requirements and the DOC's own internal rules.

190.  Where policies did exist which forbade Romero from having sexual contact with the women in his custody, these policies were in effect meant to be self-enforcing. That is, the only person to ensure that Romero did not have sexual contact with an inmate was Romero himself. He was left in charge of an entire unit of vulnerable women and was permitted to escort them alone to different parts of the prison with no one else to watch-over or supervise him.

*The Defendants Failed to Adequately Establish, Implement or Enforce*

*Investigative Procedures Related to Sexual Abuse*

191.    Each individual defendant had official responsibility for the implementation of policies and procedures related to the detection and investigation of sexual assault.

192.    In the prison setting, PREA requires that mental health staff must undergo training on the clinical indicators of sexual abuse in prison settings.

193.    PREA obligated Defendants, including Mental Health Director McGinty, to ensure that line mental health staff received supervision and specialized training on how to detect incidents of sexual abuse and to report suspicions of sexual abuse based on clinical indicators.

194.    This includes the obligation to instruct, supervise, train, and implement a policy that mental health professionals not simply rely on direct reports of sexual assaults by inmates, but to utilize a "passive surveillance system" whereby staff must complete an incident form for each inmate exhibiting symptoms or injuries consistent with sexual abuse.

195.    Victims of sexual assault in prison, for several reasons, reasonably fear retaliation or retribution by the very guards who have tremendous power over their movements and survival.

196.    Accordingly, each individual Defendant, including Defendant McGinty, knew that relying solely on the women's own reporting increased the likelihood that the abuse would not be addressed and that future abuse would occur.

197.    DOC polices and PREA mandated that all "allegations" of staff-on-inmate sexual harassment/sexually abusive behavior shall immediately be reported by staff members, including mental health staff, to the Shift Commander verbally and

followed up with a confidential incident report to the Superintendent before the end of the staff member's shift.

198.   Moreover, medical and mental health professionals are required to identify and document inmates who are at a risk of imminent sexual abuse.  Medical staff members must document the risk through confidential reports transmitted to the Superintendent to ensure that appropriate steps are taken.

199.   In October 2019, medical and mental health employees who treated Ms. B. had reasonable suspicion to justify an order for a vaginal swab for STI testing.

200.   From January through March 2020, as Romero's sexual assaults continued, Ms. B. presented with increased trauma symptoms where mental health evaluators recorded an increase in flashbacks, night terrors, and believed she was "genuinely distressed."

201.   From March through July 2020, Ms. G. also presented with increased trauma symptoms and was regularly ingesting caustic chemicals.

202.   Either medical and mental health professionals failed to report their suspicions to the Superintendent or Shift Commander, or the Superintendent or Shift Commander ignored it, in effect allowing Defendant Romero to continue to sexually abuse Ms. B. and Ms. G. through March 2020.

> *The Defendants repeatedly refused F.B. and G.G. treatment services and activities in the East Unit and provided inadequate mental health care despite their dire need for therapeutic treatment.*

203.    Each individual Defendant, including Mental Health Director McGinty, had

official responsibility for the implementation of policies and procedures related to

limiting solitary confinement in both the disciplinary and medical/mental health

setting.

204.    The DOC provides programs and treatment services, including but not limited to,

medication-assisted treatment and recovery classes in a group setting to inmates

housed in the East Unit.

205.    The Defendants failed in each of the of the following with regards to their duty to

provide adequate mental health treatment.   Defendants failed to:

   a.   implement a basic program for the identification of, individualized treatment

       for, and supervision of women with suicidal or self-harming tendencies;

   b.   provide treatment which entailed more than segregation in a solitary cell and

       close supervision of the patients; and

   c.   provide treatment that requires participation of trained mental health

       professionals, who must be employed in sufficient numbers to identify and

       treat in an individualized manner those women suffering from serious mental

       disorders.

206.    Beginning in November 2019, each time Ms. B. or Ms. G. suffered a mental

health crisis – which in many instances were brought on by Romero's sexual assaults

– they were removed from the East Unit and subjected to nothing more than

prolonged isolation.

207.    When the Plaintiffs were in solitary confinement, the Defendants restricted their

access to opioid treatment services, work programs, recovery classes, canteen, and in-

person visits with family members, which other inmates otherwise had access to in the East Unit, and Defendants failed to provide them with any other therapeutic services.

208.    While in isolation, each Plaintiff repeatedly petitioned mental health professionals supervised by Defendant McGinty for assistance with "processing" their traumas.

209.    The Defendants were aware of the substantial risk of harm to the Plaintiffs' psychological and physical health and the increased likelihood that the Plaintiffs would engage in self-harming behaviors when they deprived them of therapeutic and opioid treatment services.  The Defendants disregarded this risk and reality.

210.    As a result of the Defendants' actions and omissions, Plaintiffs' self-harming symptoms increased and were exacerbated by the Defendants' use of prolonged isolation, lack of therapeutic care, and unreasonable delay.

211.    The Plaintiffs continue to suffer severe emotional distress, trauma and other injuries caused by Defendants and by the Defendants failure to treat them adequately, properly, and with basic human dignity.


**STATEMENT OF JURISDICTION**

212.    This action arises under the Constitution and laws of the United States.

213.    This Court has subject matter jurisdiction over all claims arising under the United States Constitution, 42 USC § 1983, and the Americans with Disabilities Act, 42 USC §12101 et. seq.

214.    This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 1331, 2201 and 2202.

215.    This Court has supplemental jurisdiction over all state law claims under 28 USC §

1367(a).

216.    Venue lies in the District of Massachusetts pursuant to 28 USC 1391(b).  The

events giving rise to this action occurred in this District.

**FEDERAL CAUSES OF ACTION**

**COUNT 1**

**42 U.S.C. § 1983: Constitutional Violations Against Defendant Romero in his
individual capacity**

217.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs

as if fully set forth herein.

218.    The Defendant acted as an employee of the DOC, a state-run prison, and was

acting under color of state law.

219.    The Defendant sexually assaulted the Plaintiffs for his personal gratification and,

as a result, wantonly inflicted unnecessary pain on them.

220.    Contemporary standards of decency have evolved to the point that any sexual

assault of a prisoner by a prison employee constitutes cruel and unusual punishment.

221.    In Massachusetts, it is impossible for a prisoner to validly consent to sexual

contact with a prison guard, because sexual contact between prisoners and prison

employees is a crime and punishable by imprisonment.

222.    Moreover, the circumstances of imprisonment for the Plaintiffs meant that they

were pressured, coerced, threatened and otherwise forced to perform sexual acts on

Defendant Romero and that such performance was essential to their survival.

223.    Defendant Romero violated the Plaintiffs fundamental rights to personal security,

bodily integrity, to be free from sexual assault, to be free from cruel and unusual

punishment and to due process of law as guaranteed to them by the Eighth and

Fourteenth Amendments to the United States Constitution and to article 26 of the

Massachusetts Declaration of Rights.

224.    As a direct and proximate result of the aforesaid alleged acts and conduct and the

injuries they sustained therefrom, the Defendant has caused the Plaintiffs

psychological harm, humiliation, degradation, pain and suffering, and they are

entitled to damages.

## COUNT 2

**42 U.S.C. § 1983: Constitutional violations against Commissioner Carol Mici, Superintendent Suzanne Thibault, Superintendent Kristie Ladouceur, Deputy Superintendent Patricia Malanson, Deputy Superintendent John Dean, Deputy Superintendent of Operations Keith Nano, Director of Security Ryan Donlon, Housing Unit Captain Robert Lefort, Special Housing Unit Captain Robert Tarantino, Commander of Inner Perimeter Security David Tucker, Mental Health Director Morgan McGinty,  and John Doe 1-10, in their individual capacities.**

225.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs

as if fully set forth herein.

226.    The Defendants, operating a state-run prison, were acting under color of state law.

227.    Each individual defendant had official responsibility for policies, procedures,

supervision and training related to the prevention, detection and deterrence of sexual

abuse.

228.    The Defendants had a duty to protect Ms. B. and Ms. G.

229.    The Defendants created an unreasonable risk of sexual assault of which

Defendants were aware and to which they were recklessly and deliberately

indifferent, and the foreseeable constitutional violations described herein resulted

from the Defendant's failures and omissions.

230.   Defendants failed to maintain, enforce, establish and/or implement policies and practices necessary to prevent, detect and deter sexual assault.

231.   Defendants failed to train prison personnel on how to prevent, detect and deter sexual assault.

232.   Defendants failed to supervise their employees to ensure that they enforced policies and procedures meant to detect, deter and prevent sexual assault.

233.   Defendants failed to supervise their employees to ensure that they did not sexually assault the women in their custody.

234.   Each individual Defendant had personal knowledge of the inadequate policies, practices, supervision and training which allowed Romero to sexually assault the Plaintiffs on approximately fifty occasions for a minimum of six months all while remaining under the nose of his superiors.

235.   Defendants' actions and omissions directly caused the Plaintiffs to be deprived of their rights to personal security, bodily integrity, to be free from sexual assault, to be free from cruel and unusual punishment and their rights to due process of law as guaranteed to them by the Eighth and Fourteenth Amendments to the United States Constitution and to article 26 of the Massachusetts Declaration of Rights.

236.   Defendants' unlawful, intentional, knowing, willful, purposeful, reckless misdeeds and omissions caused the following injuries on the Plaintiffs: severe mental anguish, emotional distress, humiliation, indignities, embarrassment, loss of self-esteem, pain, degradation and suffering.

237.   At the time of the Defendants' actions and omissions, a prisoner's rights to personal security, bodily integrity, and to be free from sexual assault by prison guards was a clearly established right.

238.   All alleged acts, misdeeds and omissions committed by the Defendants as described herein for which liability is claimed were intentional, knowing, willful, purposeful, reckless, and the conduct of Defendants meet the standard for imposition of punitive damages.

## COUNT 3

**42 U.S.C. § 1983: Eighth Amendment Violation Claim for Inadequate Medical Care against Commissioner Carol Mici, Superintendent Suzanne Thibault, Superintendent Kristie Ladouceur, Deputy Superintendent Patricia Malanson, Deputy Superintendent John Dean, Deputy Superintendent of Operations Keith Nano, Director of Security Ryan Donlon, Housing Unit Captain Robert Lefort, Special Housing Unit Captain Robert Tarantino, Commander of Inner Perimeter Security David Tucker, Mental Health Director Morgan McGinty, WellPath and John Doe 1-10, in their individual capacities.**

239.   Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

240.   Each individual defendant had official responsibility for policies, procedures, supervision and training including that which related to inmate medical care and decisions to confine them to solitary confinement.

241.   The Defendants were acting under color of state law.

242.   For over ten years, the Defendants were aware that the restrictive housing conditions and prolonged isolated confinement of inmates with severe mental illness and opioid dependence created a substantial risk of harm to the Plaintiffs' mental health and physical safety.

243.    Subjecting Plaintiffs to prolonged isolation experienced in disciplinary and other

forms of segregation within the prison caused them physical and psychological

suffering, exacerbated their existing mental illnesses, exposed them to heightened risk

of other serious medical conditions, including but not limited to, triggered relapse into

active addiction, overdose, and death.

244.    WellPath, as a private entity, maintained a policy or custom of repeatedly refusing

to provide adequate mental health services to women placed in solitary confinement

or restrictive housing as the result of a mental health crisis.

245.    All Defendants' continued imposition of solitary and segregated confinement on

these Plaintiffs under these circumstances and Defendants' failure to provide

adequate health care amounted to deliberate indifference to serious medical needs in

violation of the Eighth Amendment's prohibition against cruel and unusual

punishment.

## COUNT 4

### 42 U.S.C. § 12101 et. seq.: Americans with Disabilities Act (ADA) Violation Claim against the Department of Correction (DOC)

246.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs

as if fully set forth herein.

247.    The DOC and its facility, MCI Framingham, which are overseen and/or run by

Defendants, are public entities subject to the Americans with Disabilities Act (ADA).

248.    Drug addiction is a "disability" under the ADA. See 42 U.S.C. § 12102 and

12131(2); 28 C.F.R. § 35.108 (the phrase "physical or mental impairment includes,

but is not limited to … drug addiction, and alcoholism.")

249.    Plaintiffs' disabilities substantially limited one or more major life activities, including but not limited to, caring for oneself, communicating, and working.

250.    The Defendants confirmed that the Plaintiffs suffered from opioid use disorder and severe mental illness, including, but not limited to, chronic post-traumatic stress disorder.

251.    The ADA requires the DOC to ensure that qualified inmates with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

252.    The ADA requires the DOC to ensure that inmates with disabilities are housed in the most integrated setting appropriate to the needs of the individuals and forbids it from placing inmates with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed.

253.    The Defendants failed to house Plaintiffs in the most integrated setting appropriate to meet their needs.

254.    The Defendants discriminated against Plaintiffs by repeatedly confining them to solitary confinement, thereby excluding Plaintiffs from participation in, and denying them the benefits of, therapeutic services, addiction recovery programs, and activities available to prisoners who are housed in the East Unit.

255.    On the basis of Plaintiffs' disability, the Defendants confined Plaintiffs to solitary confinement, which does not offer the same programs as the East Unit, thus violating their rights and guarantees as conferred on them by the ADA.

**STATE CAUSES OF ACTION**

## **COUNT 5**

**M.G.L. ch. 12 §§ 11I & 11H: Violation of Massachusetts Civil Rights Act by Threats, Intimidation, or Coercion Against Defendant Romero in his individual capacity**

256.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

257.     While confined at MCI Framingham and being that Plaintiffs well-being was at the mercy of the Defendants, Defendant Romero coerced, threatened, and intimidated Plaintiffs to perform degrading sexual acts which violated the Plaintiffs' rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and article 26 of the Massachusetts Declaration of rights.

258.     Defendant Romero's alleged aforesaid acts and conduct caused Plaintiffs' emotional distress, humiliation, degradation, and physical harm, and they are entitled to damages.

## **COUNT 6**

**Indecent Assault and Battery against Defendant Romero in his individual capacity**

259.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

260.     While Plaintiffs were in his care, custody and control, Defendant indecently assaulted and battered both Plaintiffs thereby causing both Plaintiffs injury and damages.

261.     Defendant Romero's acts caused Plaintiffs' physical injury, trauma, mental anguish, and suffering, and they are entitled to damages.

## COUNT 7

**Intentional Infliction of Emotional Distress against Romero in his individual capacity**

262.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

263.    Defendant Romero's actions were intentional, knowing, willful and purposeful and was outrageous beyond all bounds of human decency which a civilized society should tolerate, and the Defendant knew or should have known that his alleged conduct would inflict severe emotional distress upon Plaintiffs.

264.    Plaintiffs have suffered severe physical, mental and emotional distress, including pain and suffering, and other damages as a result of the aforesaid alleged acts and conduct of the Defendant.

265.    Plaintiffs are entitled to damages for their injuries caused by the Defendants' wanton and reckless conduct.


## DEMAND FOR DECLARATORY JUDGMENT

266.    Plaintiffs request that the Defendants be ordered to:

a.    Integrate training for mental health staff and prison guards who supervise inmates in treatment-designated settings with regards to the vulnerabilities of women with severe mental illness and opioid dependence;

b.    Ensure that there are at least two or more prison guards on a particular unit at any given time;

c.  Enforce prison policies at all levels related to documentation of accountability checks, inmate counts, proper relief from posts, and active monitoring of security cameras;

d.  Implement a policy requiring all DOC staff to inform all inmates of their rights to off-site mental health services should they allege or report sexual abuse;

e.  Sufficiently staff the prison with mental health professionals;

f.  Revise and/or enforce a policy requiring health professionals to respond promptly to inmate mental health crises;

g.  Provide sufficient resources to adequately staff the medical and mental health professionals;

h.  Require daily out-of-cell evaluations by a mental health professional to determine whether an alternative to segregation exists when an inmate is confined to a solitary cell in either the disciplinary or mental health setting;

i.  Require mental health professionals to deliver more comprehensive care and treatment for inmates with severe mental illness or opioid use disorder, including, but not limited to, regular and adequate face-to-face therapeutic services for inmates on mental health watch/in segregation;

j.  And any other declaratory relief this Court deems just.


WHEREFORE, Plaintiffs request that the Court:

a.  Enter judgment in their favor against all Defendants on all Counts of the Complaint;

b.  Order declaratory relief such as the Plaintiffs have requested;

c.  Award to Plaintiffs and against Defendants compensatory damages, jointly and severally, in an amount to be determined at trial;

d.  Award to Plaintiffs punitive damages, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct by Defendants in the future;

e.  Award to Plaintiffs and against Defendants pre-judgment and post-judgement interest on all sums awarded to them in this action and further award to them recovery of their costs concerning this action, including reasonable attorneys' fees; and,

f.  Grant Plaintiffs any other such relief to which they may be entitled.

## CONCLUSION

Plaintiffs demand judgment in such amount as this Court shall deem fair and just, plus such costs, attorneys' fees and interest as the Plaintiffs are entitled to recover and such declaratory and/or injunctive relief as this Court may order.

**THE PLAINTIFFS DEMAND A JURY TRIAL AS TO ALL COUNTS SO TRIABLE.**

> Respectfully submitted,
> F.B.,
> G.G.
> By their attorneys:
> Zachary Lown, Esq.
> */s/Zachary Lown*
> 50 Congress Street, Suite 600
> Boston, MA 02109
> t: 617-676-7339
> ZacharyLown@LownLawFirm.com
>
> J. Connie Tran, Esq.
> */s/ J. Connie Tran*
> 50 Congress Street, Suite 600
> Boston, MA 02109

t: 617-744-9365
JCTranLaw@gmail.com

October 31, 2022